### OCCIDENTAL PETROLEUM CORPORATION

v.

### SECURITIES AND EXCHANGE COMMISSION, Appellant.

No. 87–5279.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 28, 1988.

Decided April 21, 1989.

Richard M. Humes, Asst. Gen. Counsel, S.E.C., with whom Daniel L. Goelzer, Gen. Counsel and Karen MacRae Smith, Atty., S.E.C., Washington, D.C., were on the brief, for appellant.

Paul Gonson, Atty., S.E.C., Washington, D.C., also entered an appearance for appellant.

John T. Boese, Washington, D.C., with whom Robert E. Juceam, New York City, was on the brief, for appellee. C. Sanders McNew also entered an appearance for appellee.

Before ROBINSON, SILBERMAN, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

This is a reverse-Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1982), action in which Occidental Petroleum Corporation seeks to prevent the Securities and Exchange Commission from releasing documents it obtained during its 1977 investigation into whether the company engaged in bribery of, or otherwise made questionable payments to, foreign officials. The district court, Gesell, J., finding the record inadequate for judicial review under the Administrative Procedure Act, 5 U.S.C. § 706(2) (1982), remanded the case to the SEC for further proceedings. *Occidental Petroleum Corp. v. Securities and Exchange Commission*, 662 F.Supp. 496 (D.D.C.1987). The SEC appeals from that ruling, asserting that the district court impermissibly required it, on remand, to follow specified procedures beyond those required by law, contrary to *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The SEC also argues that the record before the district court was fully adequate for meaningful judicial review.

We affirm the district court in all respects. As a preliminary matter, however, we must address the question of our jurisdiction to hear this appeal.

## I. APPELLATE JURISDICTION

██ Occidental has moved to dismiss the appeal for lack of appellate jurisdiction on the ground that the district court's remand order was interlocutory and not immediately appealable.

Section 1291 of the Judicial Code provides that "[t]he courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States...." 28 U.S.C. § 1291 (1982). This final order rule serves a number of important interests. As the Supreme Court recently noted:

> Pretrial appeals may cause disruption, delay, and expense for the litigants; they also burden appellate courts by requiring immediate consideration of issues that may become moot or irrelevant by the end of trial. In addition, the finality doctrine protects the strong interest in allowing trial judges to supervise pretrial and trial procedures without undue interference.... The judge's ability to conduct efficient and orderly trials would be frustrated, rather than furthered, by piecemeal review.

*Stringfellow v. Concerned Neighbors in Action,* 480 U.S. 370, 380, 107 S.Ct. 1177, 1184, 94 L.Ed.2d 389 (1987).

The SEC urges that this appeal falls within the "collateral order" exception announced by the Supreme Court in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). In *Cohen,* the Court held that certain orders, while technically not final in the sense that they dispose of the merits of the litigation, may nonetheless be immediately appealed as of right. 337 U.S. at 545–47, 69 S.Ct. at 1225–26. *See also Bachowski v. Usery,* 545 F.2d 363, 368, 370 (3d Cir.1976).

An appealable collateral order must: " '(i) conclusively determine the disputed question'; (ii) 'resolve an important issue completely separate from the merits of the action'; and (iii) 'be effectively unreviewable on appeal from a final judgment.' " *Stringfellow,* 480 U.S. at 375, 107 S.Ct. at 1181 (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978)). The Court recently explained that the relevant inquiry under the third test is whether the putative appellant's interests "will be 'irretrievably lost in the absence of an immediate appeal.' " *Id.* 480 U.S. at 376, 107 S.Ct. at 1182 (quoting *Richardson–Merrell Inc. v. Koller,* 472 U.S. 424, 431, 105 S.Ct. 2757, 2761, 86 L.Ed.2d 340 (1985)).

The SEC argues that the district court's decision meets all three *Cohen* tests, in that (1) the decision conclusively determines the disputed question of the legal standard pursuant to which the agency must conduct the proceedings on remand; (2) that issue is separate from the merits of Occidental's underlying claim for confidential treatment; and (3) the agency will not have the option of appealing that issue after a final determination on the merits because, regardless of whether it ultimately determines to release or to withhold the contested documents, it is required to apply the standard laid down by the district court and challenged on this appeal.

The Court of Appeals for the Seventh Circuit, in a helpful analysis of the collat-eral order doctrine, identified irreparable harm as the most critical factor bearing on whether a decision is immediately appealable. *Palmer v. City of Chicago,* 806 F.2d 1316, 1318 (7th Cir.1986). In a functional and pragmatic approach to the issue, it pointed out, the proper inquiry on the question of irreparable harm is not merely whether postponing review until the conclusion of the litigation would irreparably harm the would-be appellant, but also whether an interlocutory appeal, by interfering with ongoing proceedings in the district court, would itself cause harm. Proceeding from that standpoint, the court concluded that "an order is collateral if an appeal would not interfere with the litigation in the district court," and that "[a]n order that is collateral in this sense is appealable immediately if postponing appellate review till the end of the case would cause substantial irreparable harm to the party against whom the order was directed." *Id.* at 1319. *See also Mitchell v. Forsyth,* 472 U.S. 511, 525, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) ("A major characteristic of the denial or granting of a claim appealable under *Cohen*'s 'collateral order' doctrine is that 'unless it can be reviewed before [the proceedings terminate], it can never be reviewed at all.' ") (citations omitted).

The Supreme Court has apparently never addressed the issue of whether an order remanding a case for further proceedings before an administrative agency is "final" within the meaning of § 1291, nor has it had occasion to decide whether the collateral order exception has any application to such an order. The courts of appeals that have considered the question, however, have uniformly held that, as a general rule, a remand order is "interlocutory" rather than "final," and thus may not be appealed immediately (unless, of course, it is certified pursuant to § 1292). *See Mall Properties, Inc. v. Marsh,* 841 F.2d 440, 441 (1st Cir.1988); *Dalto v. Richardson,* 434 F.2d 1018, 1019 (2d Cir.1970); *Bachowski,* 545 F.2d at 372–73; *Newpark Shipbuilding & Repair, Inc. v. Roundtree,* 723 F.2d 399, 404 (5th Cir.1984); *Whitehead v. Califano,* 596 F.2d 1315, 1319 (6th Cir.1979); *Free-*

man *United Coal Mining Co. v. Director, Office of Workers' Compensation Programs,* 721 F.2d 629 (7th Cir.1983); *Bohms v. Gardner,* 381 F.2d 283, 285–86 (8th Cir. 1967); *Gilcrist v. Schweiker,* 645 F.2d 818, 818–19 (9th Cir.1981); *Loffland Brothers Co. v. Rougeau,* 655 F.2d 1031, 1032 (10th Cir.1981); *Howell v. Schweiker,* 699 F.2d 524, 526–27 (11th Cir.1983); *Cabot Corp. v. United States,* 788 F.2d 1539, 1542 (Fed. Cir.1986). In so holding, the courts have generally pointed out that a party claiming to be aggrieved by final agency action can appeal, if still aggrieved, at the conclusion of the administrative proceedings on remand. *See, e.g., Mall Properties,* 841 F.2d at 443; *Freeman United Coal,* 721 F.2d at 631; *Howell,* 699 F.2d at 526.

This and other courts of appeals have recognized an exception to this general rule, however, where the agency to which the case is remanded seeks to appeal and it would have no opportunity to appeal after the proceedings on remand. *See Gueory v. Hampton,* 510 F.2d 1222, 1225 (D.C.Cir. 1975); *United States v. Alcon Laboratories,* 636 F.2d 876, 884–85 (1st Cir.1981); *Cohen v. Perales,* 412 F.2d 44, 48 (5th Cir.1969); *Stone v. Heckler,* 722 F.2d 464, 467 (9th Cir.1983); *Bender v. Clark,* 744 F.2d 1424, 1428 (10th Cir.1984); *Huie v. Bowen,* 788 F.2d 698, 703 (11th Cir.1986). *See also Mall Properties,* 841 F.2d at 442–43 (dictum); *Director, Office of Workers' Compensation Programs v. Brodka,* 643 F.2d 159, 161–63 (3d Cir.1981) (dictum); *Cabot Corp.,* 788 F.2d at 1544 (dictum).

In these cases, the courts have focused largely on the issue of comparative irreparable harm that the Seventh Circuit identified as paramount in *Palmer, see, e.g., Bender,* 744 F.2d at 1427 ("[t]he critical inquiry is whether the danger of injustice by delaying appellate review outweighs the inconvenience and costs of piecemeal review"), and have stressed the agency's inability to pursue an appeal from its own later decision, *id.* at 1428; *Cohen v. Perales,* 412 F.2d at 48. As the SEC points out, when a district court directs an agency to proceed under a certain legal standard, the agency has no choice but to conduct its proceedings and to render its decision pur-

suant to that standard. Unless another party appeals that decision, the correctness of the district court's legal ruling will never be reviewed by the court of appeals, notwithstanding the agency's conviction that the ruling is erroneous.

We were presented with such a situation in *Gueory.* There, an employee of the United States Postal Service, having been convicted of manslaughter, was removed from his job pursuant to Civil Service Commission regulations providing for removal in cases of "criminal ... conduct." 510 F.2d at 1223 (quoting 5 C.F.R. § 731.201). The employee sued and the district court held that the government was required to make a specific showing of the plaintiff's unsuitability for employment in order to justify his discharge. Accordingly, the court remanded the matter to the Commission for further proceedings under the stated legal standard.

On appeal by the Commission, this court held that the district court's remand order was "final" within the meaning of § 1291 and *Cohen.* Judge Tamm, writing for the court, reasoned, *id.* at 1225:

> The remand to the Civil Service Commission is appealable because if review were not allowed now, the Government would probably never be able to test the legal correctness of the finding that in a dismissal for "criminal conduct" there must be an additional statement of exactly how the conduct diminishes the efficiency of the service.

The Court of Appeals for the Ninth Circuit has characterized *Gueory* as resting on the "death knell" doctrine—the finality principle developed by several of the courts of appeals in reviewing orders denying class certification (and thus, as a practical matter, sounding the death knell for any continued prosecution of the action). *See Eluska v. Andrus,* 587 F.2d 996, 1000 & n. 8 (9th Cir.1978). The Ninth Circuit has questioned the continuing viability of *Gueory,* so characterized, in light of the Supreme Court's subsequent disapproval of the death knell doctrine in *Coopers & Lybrand,* 437 U.S. at 477, 98 S.Ct. at 2462.

*See Eluska,* 587 F.2d at 1000. Not surprisingly, Occidental urges us to abandon *Gueory* as inconsistent "with the Supreme Court's subsequent holdings ..., which require a strict adherence to, and narrow interpretation of, the requirements for employing the *Cohen* collateral order doctrine."

We do not believe that the correctness of our holding in *Gueory* depended upon the "death knell" doctrine, which was developed for the analytically distinct issue raised by an appeal from an order denying class certification. That type of order does not necessarily preclude the would-be appellant from litigating the issue; the plaintiff, though unable to proceed on behalf of a class, has the option of pursuing his individual claim, *Coopers & Lybrand,* 437 U.S. at 467, 98 S.Ct. at 2457, and of appealing from the certification decision after a determination on the merits of that claim. *Id.* at 469, 98 S.Ct. at 2458. In *Gueory,* by contrast, the agency would never have had the opportunity to appeal from its own decision on remand, and thus could never have challenged the standard, imposed by the remand order, under which it reached that decision.

Indeed, the Ninth Circuit's doubts about *Gueory* seem to have been directed not so much at the result, but at our characterizing the remand in *Gueory* as "final." Other courts of appeals have since held that such orders are not final, but may nonetheless be reviewable as non-final collateral orders under the *Cohen* doctrine. *See, e.g., Huie v. Bowen,* 788 F.2d at 701–02 (order remanding benefit dispute to the Secretary of Health and Human Services was appealable as a "collateral order[ ] which [is] not [a] final order[ ]"). At least in the present context, the distinction between a final order and an interlocutory order that is nonetheless appealable under the collateral order doctrine is, as a practical matter, purely terminological. The result in *Gueory* is entirely consistent with that reached by the other courts of appeals in more recent cases. For example, in a case procedurally indistinguishable from *Gueory,* the Ninth Circuit held that the Secretary of Health and Human Services could appeal a district

court order setting evidentiary guidelines for further proceedings before the Secretary. Although it concluded that the order was appealable as a collateral, rather than as a final, order, the court reasoned, as we had in *Gueory* that:

> On remand, the Secretary would be required to apply this legal standard. If, under this standard the Secretary found no jobs available, she must award disability benefits. She would not be able to appeal from such a finding.

*Stone v. Heckler,* 722 F.2d at 467.

Thus, we see that the rationale of *Gueory* is not only sound as a practical matter, but also entirely consistent with recent decisions applying the collateral order doctrine. When an agency to which a dispute has been remanded seeks to appeal the legal standard imposed by the district court for the governance of the proceedings on remand, (1) the court of appeals is generally called upon "conclusively [to] determine the disputed question" of the applicable legal standard, *Stringfellow,* 480 U.S. at 375, 107 S.Ct. at 1181 (quoting *Coopers & Lybrand,* 437 U.S. at 468, 98 S.Ct. at 2458); (2) the question of the appropriate legal standard will, again in most cases, be "an important issue completely separate from the merits of the action," *id.;* and (3) if the agency would not have an opportunity to appeal the district court's legal ruling after the proceedings on remand, then the order is by definition "effectively unreviewable on appeal from a final judgment." *Id.* Moreover, "the district court's decision ..., if wrong, would result in a totally wasted proceeding" on remand, *Stone v. Heckler,* 722 F.2d at 467, and may yet bind the agency in future cases. Surely, to recur to the Seventh Circuit's analysis, these burdens may constitute "substantial irreparable harm to the [agency]." *Palmer,* 806 F.2d at 1319.

We recognize that the *Gueory* rule produces asymmetrical results; while a private party may not, in most cases, immediately appeal a district court order remanding a case for further agency proceedings, the agency may do so. That asymmetry derives, however, from the formulation of

the *Cohen* test, under which the question of appealability turns to a great extent on whether a putative appellant could challenge the remand order after a final determination on the merits.

Having reaffirmed both the holding and the rationale of *Gueory,* we find that case dispositive of the present question of our appellate jurisdiction at this interlocutory stage. As discussed more fully below, one of the central issues in this appeal is whether the district court correctly placed upon the SEC the burden of substantiating its determination that certain information contained in documents for which Occidental sought confidential treatment was publicly available; if the information was already public, of course, the documents could not be withheld from disclosure under the FOIA exemption for confidential business information. The correct allocation of the burden of production in these proceedings is potentially dispositive. Another critical issue in this appeal is whether the district court in fact ordered the SEC to provide document-by-document justification for denying confidential treatment, and if so, whether the court erred thereby. This question is also of great importance, in light of the burden such a requirement might impose upon the SEC in this and in subsequent cases. Further, as the Seventh Circuit stated in a different context in *Palmer,* immediate review in this case "would not interfere with the litigation in the district court," 806 F.2d at 1319, since that litigation is, at least for the time being, in remission.

Finally, and most important, if the SEC is not permitted to appeal the district court's order now, it will be bound to proceed under the legal standard imposed by the district court. (Its only other choice would be to violate the court's order and risk contempt, which we do not think Congress, in enacting § 1291, intended to encourage, and which the SEC has not intimated it will do.) Whether the SEC ultimately rules for disclosure or for confidential treatment of any particular document, it will not be able to appeal its own decision. Only Occidental or the FOIA requestor, whichever is aggrieved, will be able to

pursue the matter back to the district court and thence to this court. We do not think Congress intended that the final order rule place the agency in such a position of dependence upon the self-interest of others in order to get review of a legal decision that, in this case and other later cases, so much affects its interest in manageable and legally correct standards and procedures for handling reverse-FOIA claims. We therefore hold that we have jurisdiction to hear this appeal.

## II. BACKGROUND

This dispute began in 1981 when John W. Shaver Nava made a FOIA request for documents relating to the SEC's 1977 investigation of allegations that Occidental had bribed foreign officials or otherwise made questionable payments abroad. The SEC duly advised Occidental of Shaver Nava's request, and the company, on October 8, 1982, submitted to the SEC FOIA officer a letter asserting that the documents were confidential and thus exempt from disclosure under, *inter alia,* Exemption (4), which applies to "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4) (1982). In this letter Occidental said that once the SEC had identified the potentially responsive materials, it would make arrangements to have the material indexed in order "to ensure that the generic objections to disclosure raised herein are properly asserted."

Shortly thereafter, the FOIA office informed Occidental that it had received a request for Occidental's substantiation of its confidentiality request, and that Occidental's October 8 letter and one earlier letter were themselves subject to disclosure under the FOIA. Occidental objected in writing on a number of grounds, but the FOIA office determined that the letters were not exempt, and in February 1983, released them to Shaver Nava.

Meanwhile, Occidental and FOIA office representatives were apparently engaged in oral negotiations over the SEC's re-

sponse to Shaver Nava's original FOIA request. Ultimately, the FOIA office deemed approximately 8,000 documents responsive to that request. The representatives then met regularly over a period of several months to review the documents. At these meetings, Occidental voiced oral, document-specific objections, which the FOIA staff noted in the margins or on stickers on its copy of the documents.

In June, the FOIA office notified Occidental by letter that it required a specific, written substantiation of Occidental's requests for confidential treatment. In July, Occidental replied by re-asserting, in writing, its general objections and referring to the document-by-document review that was still on-going between itself and the FOIA staff. Thereafter, the FOIA office informed Occidental that it would "entertain any arguments or factual presentations relevant to [its] claim of confidentiality of specific documents or clear and distinct categories of documents," but that on January 30, 1984, the staff would make its determination with or without such a substantiation.

In response, Occidental submitted a letter taking the position that it had, in the course of its meetings with the FOIA staff, orally "identified those documents (and/or categories of documents) for which confidential treatment under the Constitution, the FOIA and other provisions of law continues to be warranted." In any event, Occidental's letter identified general categories of documents (such as those relating to ongoing commercial relations with foreign countries), and asserted that the release of those documents would cause it competitive harm.

In a June 1984 letter, the FOIA office informed Occidental that, with certain unspecified exceptions, the documents would be released. The letter did not indicate why some claims to exemption had been rejected, but noted that an Occidental representative "was present during the [FOIA staff's] review of material covered by [the] confidential treatment request," and that he "is aware of the information subject to these exemptions as well as those records we proposed to release in full or in part."

Occidental promptly noted its appeal to the office of the SEC General Counsel, and in September submitted a 60-page letter setting forth both legal arguments and a number of factual assertions relating to Occidental's commercial interests that would be damaged by release of the disputed documents. The letter also suggested that the General Counsel receive oral evidence on appeal, as the FOIA office had done in the course of the initial review, in order to reduce the burden of a written "page by page" analysis of the documents.

The General Counsel rejected both this procedural proposal and the "broad generic substantiation ... contained in [the] letter...." Instead, he suggested:

If Occidental wishes to resubmit its substantiation, we recommend that it submit a written substantiation that specifically divides the documents for which it requests confidentiality into categories, noting by document number which documents fall within a particular category. The substantiation should specifically explain why each category of documents should not be released. In addition, we recommend that Occidental provide affidavits from corporate officers affirming the basis for claims of confidentiality and the need for continued protection.

Meanwhile back at the FOIA office, Shaver Nava was informed that Occidental had submitted a further written substantiation (presumably referring to its long September 1984 letter), and that it might submit additional substantiation materials. Not surprisingly, Shaver Nava then requested release of this written substantiation; the FOIA office informed Occidental of his request; and Occidental immediately made a written request for confidential treatment of the letter. Occidental argued that the SEC's practice of not guaranteeing the confidentiality of substantiation letters prior to a final determination of the claim to confidential treatment of the underlying documents placed the submitter in a "Catch 22" situation: the more detailed its substantiation of the claim to confidentiality,

the greater the risk that the confidential information will be released via the substantiation. The FOIA office nonetheless denied Occidental's request for confidential treatment of its September substantiation, and Occidental appealed that determination to the General Counsel.

In January 1985, Occidental submitted to the General Counsel a written, document-by-document substantiation of its request for confidential treatment, along with a complete set of the documents in dispute. Because it was concerned, in light of its previous experience, that this substantiation too might be released, Occidental did not include in it any description of the contents of the contested documents or of the specific harm that would result from their release. Rather, it placed a colored dot on each of the documents, or on each portion of the document if the whole was not covered by a single reason for opposing its disclosure. The January substantiation keyed each dot color to a specific objection, which it identified only by letters of the alphabet. Each letter-coded objection was in turn keyed to a more specific rationale set forth in Occidental's September letter. The January substantiation then identified each document by number and by dot color, and provided with respect to each document one or more of the letter-coded explanations. As a result of this cross-referenced coding system, a reader of the substantiation had to refer both to the underlying documents and to the September letter in order to understand the nature of Occidental's specific claim to confidential treatment of a particular document or portion thereof.

In the letter accompanying the January substantiation, Occidental again asserted that substantiation material was exempt from disclosure under the FOIA. Predictably, the FOIA office disagreed, and stated that Occidental would have to support any claim for confidential treatment of the substantiation with an additional substantiation. Occidental responded by asserting that the January substantiation was protected by, *inter alia,* the attorney work product privilege. The FOIA office denied Occidental's request for confidential treat-

ment of the January substantiation, and Occidental appealed that decision to the General Counsel's office, in even more than customarily plaintive terms:

> The release of these documents would mean that Occidental, which complied with the Commission's request for assistance in processing the aforementioned appeal, would have participated in the release to a requester of the very information it so assiduously sought to protect.... It was certainly not the intention of Occidental to create an "index" which would serve as a guidepost for future requests! Moreover, if the requester is granted access to both the substantive letter of September 26, 1984 and the subsequent indices and materials related thereto, the requester would, in effect, have the "roadmap" to the ... file, the release of which would be more disadvantageous for the submitter than release [of] some of the documents themselves.

In May 1986, the General Counsel issued his decision on the status of the underlying documents. This decision, which focused largely on Occidental's assertion of confidentiality under Exemption (4), divided the documents into groups pertaining to each country with respect to which illegal payments were allegedly made. Within each country group, the General Counsel further divided the contested documents by subject. He identified the specific documents contained in each subject category, using Occidental's color and numbering system, and he addressed Occidental's arguments for each group. The General Counsel accepted some of Occidental's arguments, and so determined not to release the corresponding documents.

As to the documents that he determined to release, the General Counsel's rationale varied depending upon the subject category at issue. With respect to some categories, his rationale for denying exempt status was simply that Occidental had failed to demonstrate that release of the information could harm the company's competitive position. As to most of the categories, however, the General Counsel determined

that the information had already been made public in (1) the published report of a special committee of the Occidental board of directors; (2) the Bicameral Commission Report of an investigation conducted by the Venezuelan legislature; or (3) the news media, and that

> to the extent that information in the Commission's investigative file is publicly available through other sources, I have concluded that disclosure will not cause competitive harm, and Exemption 4 is not applicable.

To take a specific example, in response to Occidental's argument that the release of materials pertaining to its contacts with Venezuelan government officials and to allegations that it made questionable payments to those officials would result in harm to Occidental's relationship with the Venezuelan government, the General Counsel stated:

> It appears that the Venezuelan government ... is familiar with most of the allegations concerning Occidental's questionable payments. These allegations are described in the Special Committee Report and the Bicameral Commission Report, and in other public sources, including newspaper articles.

Occidental brought this action in the district court pursuant to § 706 of the APA, seeking declaratory and injunctive relief from the General Counsel's decision to release the documents, to which he adhered, in all respects relevant here, first when, Shaver Nava having withdrawn his FOIA request, someone else filed a new and broader request, and again after the district court directed him to consider evidence that Occidental claimed would show a material change in circumstances since the ruling on the Shaver Nava request.

After a series of hearings, the district court found that the record was inadequate for judicial review, and remanded the dispute to the SEC for further proceedings. 662 F.Supp. 496. The Commission appeals, claiming that the district court (1) improperly concluded that the administrative record was inadequate to support the General Counsel's conclusion that the informa-

tion contained in the subject documents was already public; and (2) contrary to the teachings of *Vermont Yankee*, (a) placed upon the SEC the burden of supporting those statements by including in the record the public sources upon which the General Counsel relied and by matching the information in the disputed documents with the contents of those public sources; (b) ordered the Commission to follow specific procedures, to wit, (i) giving document-by-document reasons for rejecting Occidental's arguments; (ii) withholding disclosure of substantiation materials until the resolution of the dispute over the underlying documents; (iii) including in the administrative record the staff memorandum upon which the General Counsel relied in reaching his decision to release the documents; and (iv) providing Occidental with an opportunity to present oral argument on its claims for exempt status. After setting forth the substance of the district court's opinion and resolving some preliminary questions about the standard of review in the district court and on this appeal, we address each of the SEC's arguments in turn.

## III. DECISION UNDER REVIEW

The district court, in its opinion, undertook an extensive critique both of the SEC's general regulations for the handling of reverse-FOIA claims and of the specific procedures that it followed in this case. First, the court criticized the failure of the Commission's FOIA office to provide any explanation for its initial decision to deny confidential treatment. Specifically, the court noted:

> Occidental apparently understood that the FOIA Officer would eventually respond to Occidental's supplementary oral submissions and would give specific reasons for exempting or not exempting documents from disclosure. This, in turn, would focus issues for appeal. The FOIA Officer, however, ultimately gave no reasons in his two-page denial of confidentiality.

662 F.Supp. at 498. The court concluded that the FOIA office's failure to give par-

ticularized reasons for its denial of confidentiality put Occidental in the position of having "no information as to why it had not prevailed although it had by its written and oral submissions made a positive showing that there were grounds for continued confidential treatment." *Id.* The court therefore agreed with Occidental that the FOIA office's practice "hindered [Occidental's] ability to take an appeal on a reasoned basis...." *Id.* at 499.

Second, the district court questioned the SEC's practice of releasing substantiation materials pending the outcome of reverse-FOIA proceedings concerning the underlying documents, for the reasons Occidental had adduced in opposing such releases.

Third, the district court noted that the General Counsel based his final decision on a confidential legal and factual memorandum prepared by his staff. The General Counsel had declined the court's suggestion that he include the memorandum in the administrative record, claiming his work product privilege under *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). The district court recognized that the General Counsel "had a right to structure his consideration in this manner," 662 F.Supp. at 500, but observed that "by doing so he continued to cloak the entire matter with such secrecy that his decision as announced affords no basis on the record to even analyze the merits of his action." *Id.*

Fourth, the district court found that the General Counsel's decision did not address Occidental's claims with sufficient specificity:

> The SEC's General Counsel ... gave his generalized rulings without ... discussing Occidental's claims by document or by category of documents.
>
> The result of this flawed process is now before the Court. Since Occidental has never had an opportunity to address the issues on appeal before the General Counsel, whose ruling provides no basis for the Court to review the evidence underlying his ruling on a document-by-doc-

ument basis, this matter must be remanded for further proceedings.

*Id.* at 499.

The court explained further that "[t]o understand the obvious need for a remand it is appropriate to set out the precise role of the District Court in reviewing administrative rulings disclosing documents against a reverse-FOIA demand for continued confidential treatment." *Id.* Specifically, the court delineated its functions as (1) identifying the administrative record; (2) satisfying itself that the record adequately defined the issues and reflected the path by which the agency reached its result; and (3) determining whether the agency's rulings were "supported by substantial evidence and ... rational."

In performance of its first function, the district court concluded that "the precise nature of the administrative record remain[ed] in doubt," since the record did not contain, among other things, many of the assertedly public sources upon which the General Counsel relied in reaching his conclusion that information contained in the disputed documents was a matter of public record. With respect to its second task, the court found:

> ... The FOIA Officer's initial decision in this proceeding ... did not indicate the supporting facts or legal conclusions relied on and therefore left Occidental without adequate notice or opportunity to be heard on appeal to the decision maker who, again, acted without notice.

*Id.* As to its third function, the court stated that the General Counsel's decision, because it failed to match its explanations against particular documents, was not reviewable. *Id.* The court opined that this result might have been avoided if the FOIA office had provided an index of reasons for its initial denial of confidential treatment, but that since no such index was prepared at either administrative level, a remand was required.

Beyond these specifics, the court made it clear that it was dissatisfied with the SEC's reverse-FOIA procedure as a whole. For example, the court noted that "[t]he seed of th[e] difficulty [with the administrative

record] is found in the obvious failure of the Commission's administrative process"; that "[c]lear defects in the administrative process have been revealed and these must be remedied and can only be accomplished by a remand"; and that further proceedings were required "to correct the deficiencies the Court has noted." *Id.* at 500. Even some of the district court's more specific criticisms of the SEC's procedures were directed not at flaws in those procedures in and of themselves, but rather at their cumulative effect on the state of the administrative record. As a result, the court's opinion is not organized into separate discussions of each perceived procedural flaw. Because the SEC challenges the court's decision on a point-by-point basis, however (and at the risk of presenting a truncated version of the district court's analysis, for which we direct the reader to that court's more integrated account, at 662 F.Supp. 496), we will set forth the district court's more detailed observations on the SEC's procedures in Part V below, as we address the agency's particularized objections.

## IV. VERMONT YANKEE

The SEC's principal argument on appeal is that the district court's criticism of its procedures is tantamount to an order directing it, on remand, to alter and to supplement those procedures, and that, as such, the court's decision violates the strictures of *Vermont Yankee.* Occidental, apparently on the assumption that *Vermont Yankee* governs this case, responds on the SEC's terms, arguing that nothing in the district court's opinion can be read as ordering the SEC to adopt any specific procedures. Occidental also argues that the district court's decision was proper under *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and this court's reverse-FOIA precedents.

In *Vermont Yankee,* the Supreme Court held that a court reviewing an informal rulemaking proceeding conducted pursuant to APA § 553 may not impose upon the rulemaking agency procedural require-

ments beyond those that Congress specifically set forth in that section. The Court based its holding on the legislative history of § 553, from which it concluded that Congress intended that the procedures it specified would constitute the lawful minimum of process in informal rulemaking; an agency might, in its discretion, supplement those procedures, but a court can not compel it to do so. 435 U.S. at 545–46, 98 S.Ct. at 1212–13.

██ Reverse–FOIA actions are not informal rulemaking proceedings but are in the nature of informal adjudications, *Chrysler Corp. v. Brown,* 441 U.S. 281, 317–18, 99 S.Ct. 1705, 1725–26, 60 L.Ed.2d 208 (1979), and as such are reviewable under "the generally applicable standards of § 706." *See Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823; *AT & T Information Systems, Inc. v. General Services Administration,* 810 F.2d 1233, 1236 (D.C.Cir. 1987). In contrast to the specific procedures Congress provided in § 553 to govern informal rulemakings, *see Vermont Yankee,* 435 U.S. at 545–46, 98 S.Ct. at 1212–13, no provision of the APA contains specific procedures to govern an informal agency adjudication subject to review under § 706. Thus the precise holding of *Vermont Yankee* —that Congress intended statutorily prescribed procedures to preclude additional, judicially imposed procedures—has no direct application to our task in this case. *See* Scalia, *Vermont Yankee: The APA, the D.C. Circuit, and the Supreme Court,* 1978 Sup.Ct.Rev. 345, 384–86, 391–92, 399 n. 235. *Cf. Steadman v. Securities and Exchange Commission,* 450 U.S. 91, 102, 101 S.Ct. 999, 1008, 67 L.Ed.2d 69 (1981) (applying rationale of *Vermont Yankee* to formal adjudications under APA § 554, which is procedurally specified).

Under § 706, a court reviewing an informal agency adjudication must "hold unlawful and set aside agency action, findings and conclusions found ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). In *Overton Park,* the Supreme Court noted that "§ 706 re-

quire[s] the reviewing court to engage in a substantial inquiry," 401 U.S. at 415, 91 S.Ct. at 823, and that in doing so, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824. In order to make that determination, the court is to consider "the full administrative record that was before the [agency decisionmaker] at the time he made his decision," *id.* at 420, 91 S.Ct. at 825, and if that record does not contain an adequate explanation of the decision, the reviewing court may require the agency to make additional findings. *Id.* at 420–21, 91 S.Ct. at 826. Indeed, if it finds that "the agency factfinding procedures are inadequate," *id.* at 415, 91 S.Ct. at 823, the reviewing court may engage in *de novo* review. In choosing how best to proceed, the reviewing court "should consider which method will prove the most expeditious so that full review may be had as soon as possible." *Id.* at 421, 91 S.Ct. at 826.

In *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Court further elaborated on the function of a court reviewing an informal adjudication under § 706: "If ... there was such failure [by the agency] to explain administrative action as to frustrate effective judicial review," the reviewing court should obtain from the agency "such additional explanations of the reasons for the agency decision as may prove necessary." *Id.* at 142–43, 93 S.Ct. at 1244. If the administrative record is inadequate to support the administrator's decision, "then th[at] ... decision must be vacated and the matter remanded to him for further consideration." *Id.* at 143, 93 S.Ct. at 1244. *See also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

Nonetheless, both the SEC and Occidental appear to assume—and so shall we for purposes of this case—that a number of broad statements in the *Vermont Yankee* opinion regarding the function of judicial review of agency action have direct application to this review of an informal agency adjudication. For example, the opinion states generally that "a reviewing court may not, after determining that additional evidence is requisite for adequate review, proceed by dictating to the agency the methods, procedures, and time dimensions of the needed inquiry and order the results to be reported to the court without opportunity for further consideration on the basis of the new evidence by the agency," 435 U.S. at 545, 98 S.Ct. at 1212 (citations omitted); that "Congress intended that the discretion of the *agencies* and not that of the courts be exercised in determining when extra procedural devices should be employed," *id.* at 546, 98 S.Ct. at 1213 (emphasis in original); and that "if courts continually review agency proceedings to determine whether the agency employed procedures which were, in the court's opinion, perfectly tailored to reach what the court perceives to be the 'best' or 'correct' result, judicial review would be totally unpredictable." *Id.*

■ Nothing in the general principles of *Vermont Yankee* is inconsistent, however, with the standards for judicial review set forth in *Overton Park*. Section 706, as interpreted in the latter case, establishes a performance standard for informal action by an agency: in order to allow for meaningful judicial review, the agency must produce an administrative record that delineates the path by which it reached its decision. If the record does not meet the *Overton Park* standard, the district court may insist that the agency produce, by whatever means the agency chooses, a record that does meet the required level of performance. The general principles of *Vermont Yankee*, on the other hand, would simply forbid the reviewing court from imposing upon the agency specific procedural steps that must be followed in order to create a reviewable record, *i.e.*, a design standard.

*See* S. Breyer, *Regulation and its Reform* 105–06 (1982) (discussing performance versus design standards). Neither party has argued that *Overton Park* was limited or overruled by implication in *Vermont Yankee,* and we see nothing in the broad statements in the latter opinion to indicate any lowering of the performance standard mandated by *Overton Park.*

Accordingly, in the specific context of a reverse-FOIA action, this court has held that if the administrative record is inadequate to permit meaningful review, the district court should ordinarily, under the principles stated in *Camp v. Pitts,* remand for supplementation of the record. *AT & T,* 810 F.2d at 1236. *See also National Organization for Women v. Social Security Administration,* 736 F.2d 727, 746 (D.C.Cir.1984) (NOW) (McGowan and Mikva, JJ., concurring). The necessary implication is that where a remand is required in a reverse-FOIA case because the agency's factfinding procedures were inadequate in some regard—albeit perhaps not so stubbornly inadequate as to justify *de novo* review—the agency will want to use some other procedures in order to produce an adequate record. Moreover, any such remand decision may well involve some healthy criticism of the procedures that produced the inadequate record in the first place. After all, the district court must set forth its reasons for remanding the matter, if only in order to survive appellate review of its decision; a district court that remanded a matter for further proceedings without indicating any connection it perceived between an unacceptably opaque agency decision and the procedures from which it arose would, by its silence, disserve every relevant interest, and advance none.

In this case, the district court was not stinting in its criticism of the agency's procedures. As set forth below, however, we find that with respect to each of the SEC's objections to the district court opinion, that court, properly understood, did no more than it was either authorized or required to do by *Overton Park, Camp v. Pitts,* and *AT & T.* As a result, we need not reach the question whether at some point a reviewing court's criticism of an agency's

procedures in the course of its *Overton Park* review might, by effectively holding the agency to a specific course of proceeding where others might serve to achieve the standard of performance required under § 706, raise the same concern with judicial encroachment upon congressionally delegated agency discretion as underlay *Vermont Yankee.*

## V. THE DISTRICT COURT'S CONCLUSIONS AS TO THE STATE OF THE ADMINISTRATIVE RECORD

The principal inquiry on this appeal is whether the district court was justified in holding that the administrative record before it was inadequate for judicial review. The district court based that holding on various findings of fact with respect to the state of the record and the manner in which it was produced. The threshold question at issue before us is the appropriate standard for review of those findings.

### A. Standard of Review

■ Rule 52(a) of the Federal Rules of Civil Procedure provides that "[i]n all actions tried upon the facts without a jury ... the [district] court shall find the facts specially ..." and that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous...." Fed.R.Civ.P. 52(a). The SEC argues that, Rule 52(a) notwithstanding, we should review the administrative record *de novo,* for which proposition it claims support in our decisions in *Biloxi Regional Medical Center v. Bowen,* 835 F.2d 345 (D.C.Cir.1987) and *Walter O. Boswell Memorial Hospital v. Heckler,* 749 F.2d 788 (D.C.Cir.1984).

In *Biloxi,* we held that we would review *de novo* the district court's final determination that the agency's decision in a formal adjudication was supported by "substantial evidence" in the record considered as a whole. 835 F.2d at 348–49. In *Walter O. Boswell,* which involved review of an informal rulemaking, we noted that "[w]hen ... the District Court and this court are both

reviewing an administrative record, and no additional testimony was taken in the District Court, the District Court's decision is not generally accorded any particular deference." 749 F.2d at 790 n. 2. The SEC argues that *Biloxi* and *Walter O. Boswell* provide the appropriate standard of review in this case, since here, as in those cases, "the district court's conclusions were based on the administrative record and decision...."

We perceive a fundamental difference between this case and the other two, however. In neither *Biloxi* nor *Walter O. Boswell* were we called upon to review the district court's findings of fact as to the state of the administrative record. Rather, in each case the decision under review was the district court's assessment of the legal sufficiency of the agency's action in light of the record; our task was precisely the same as the district court's. Similarly, in *AT & T* and *NOW*, our principal reverse-FOIA precedents, the decision under review was a final determination by the district court as to the legal sufficiency of the agency's determination to disclose contested information. *See AT & T*, 810 F.2d at 1234 (order granting government's motion for summary judgment); *NOW*, 736 F.2d at 732 (Robinson, J., concurring) (preliminary injunction against disclosure).

In contrast, the present case does not involve us in a second layer of review of the agency's findings, but in an initial review of the district court's findings. We have not before directly addressed the question whether the "clear error" standard of Rule 52(a) applies to such an interlocutory review of a district court's findings as to the state of the administrative record. The Court of Appeals for the Eleventh Circuit, in an appellate posture indistinguishable from the one before us, applied that standard to review a district court's initial determination that the administrative record was adequate for judicial review under *Camp v. Pitts*. *Environmental Coalition of Broward County, Inc. v. Myers*, 831 F.2d 984, 985 (11th Cir. 1987). That approach is consistent with our decision in *Federal Trade Commission v. Lonning*, 539 F.2d 202, 210 n. 14 (D.C.

Cir.1976), where we reviewed under the "clear error" standard the district court's resolution of the essentially factual issue whether documents sought by the FTC's subpoena were relevant and necessary to its investigation.

We agree with the Eleventh Circuit that the "clear error" standard of Rule 52(a) applies here, at least with respect to the particularized factual findings that underlay the district court's determination that the administrative record as a whole was inadequate for review under *Overton Park* and *Camp v. Pitts*. In making such findings, the district court does not, as in *Biloxi* and *Walter O. Boswell*, assess the merits of the agency's decision under the statutorily prescribed standard for review of the agency action in question; the question before it is not, for example, whether the agency's findings of fact are supported by substantial evidence. Rather, because the district court is the initial finder of the facts relevant to the adequacy issue, no question peculiar to review of agency action is raised. We therefore see no reason to depart from the general mandate of Rule 52(a) that the district court's factual findings "shall not be set aside unless clearly erroneous."

We need not reach the more difficult question whether, as the Eleventh Circuit held, the district court's ultimate conclusion as to the adequacy of the record is subject to the "clear error" standard of Rule 52(a), since we find, as set forth in more detail below, that its conclusion would survive even *de novo* review.

### B. Application

We turn now to the SEC's specific objections to the district court's remand order.

#### 1. *Public Availability of Information Contained in the Contested Documents*

The district court's determinations that the administrative record was inadequate for judicial review, and that a remand was required, were based upon its finding that the record did not contain the public

sources from which the General Counsel concluded that the information for which Occidental sought confidential treatment was already public. Specifically, the court found that "[t]he prior release of information noted by the SEC, which information Occidental claims is still confidential, is only vaguely indicated and is not entirely reproduced in the administrative record." 662 F.Supp. at 500. The SEC asserts that the administrative record nonetheless contains adequate documentation to support the General Counsel's conclusion regarding prior public availability.

The difference between the SEC and the district court seems to turn on the meaning of public availability. As the district court pointed out, the thrust of the General Counsel's reasoning is that the allegations of bribes and questionable payments are a matter of public record; the SEC maintains that this is sufficient to support the General Counsel's determination to release the documents gathered by the Commission in the course of its investigation. The district court, on the other hand, reasoned that "a public news report of the inquiry ... cannot alone make all underlying documents containing commercial information automatically public if not found in the news report." *Id.*

 The court is clearly correct in this. First, the SEC's suggestion that publication of an allegation renders public, and thus subject to release on that ground alone, all information obtained in the course of the ensuing investigation is illogical, incorrect as a matter of fact, and insensitive to the Congress's purpose to protect confidential business information from disclosure. On the SEC's reasoning, a company that announces that it has developed a new product would lose its ability, at least in the context of a reverse–FOIA proceeding, to prevent the federal government from disclosing its trade secrets about the product. No such cavalier attitude toward valuable intellectual property can be squared with the terms of Exemption (4), which qualifies, to the extent necessary to protect commercial information, the gener-

al FOIA norm of citizen access to files that bear on the workings of the government.

 Thus, the only question before the General Counsel, broadly stated, was whether the contested documents contained "trade secrets and commercial or financial information [that was] privileged or confidential." 5 U.S.C. § 552(b)(4) (1982). The primary focus of that inquiry was limited to the narrower question whether disclosure of the contested documents would cause "competitive harm" to Occidental under the test of *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C.Cir.1974). In this inquiry, it is simply irrelevant that, as the General Counsel suggests, Occidental may be seeking confidential treatment for the documents in order to avoid disclosure of bribery-related information that might be damaging to its reputation. The General Counsel may or may not be correct that the allegations of harm flowing only "from the embarrassing publicity attendant upon public revelations concerning ... illegal or unethical payments to government officials" are insufficient to establish "competitive harm" under *National Parks*. We need not decide that question today. *See Public Health Research Group v. Food and Drug Administration*, 704 F.2d 1280, 1291 n. 30 (D.C.Cir. 1983) (dictum). Occidental's right to an exemption, if any, depends upon the competitive significance of whatever information may be contained in the documents, not upon whether its motive is to avoid embarrassing publicity. The SEC's role, therefore, is not to assess the overall damage, regardless of its nature, that would result from disclosure of any non-public bribery-related information to be found in the documents, but rather to determine whether any non-public information contained in those documents is *competitively* sensitive, for whatever reasons. Particularly in light of the General Counsel's further narrowing of the issue to the question whether the contested information was already a matter of public record—an inquiry which, as discussed more fully below, is inherently fact-specific—we cannot fault the district court's finding that, after a reverse-FOIA movant has made "a positive

showing," 662 F.Supp. at 498, of competitive harm from disclosure, a conclusory statement such as "You have not demonstrated that release of these documents would result in competitive harm" is unreviewable.

Moreover, the administrative record does not in fact appear to contain all of the public materials upon which the General Counsel relied, at least not in any form that is practically reviewable by the district court. For example, while the Venezuelan Bicameral Report may be "part of the record" in the sense that it is among the 8,000–plus documents at issue in this dispute, it does not appear to have been included in the slimmer set of documents that was presented to the district court (in the form of a 900–page binder) as the "administrative record." Nor (in most cases) does the General Counsel's decision relate specific information in the disputed documents to those portions of the public materials in which the information is allegedly contained. We cannot, therefore, find any error in the district court's conclusion that the record before it did not permit the court, as a practical matter, to assess the General Counsel's conclusion that whatever competitively sensitive information may have been contained in the contested documents was a matter of public record.

### 2. *Burden of Proving Public Availability*

The SEC also argues that the district court erroneously placed upon it the burden of proving that the information contained in the contested documents was publicly available. Occidental in turn contends that it should not be required to prove a negative, *viz.*, that the information has nowhere been published.

The SEC relies on our decision in *CNA Financial Corp. v. Donovan*, 830 F.2d 1132 (D.C.Cir.1987) for the proposition that "the proponent of nondisclosure carrie[s] the burden to demonstrate that its documents [are] confidential." Brief of the Securities and Exchange Commission at 40. In fact, the court in CNA stated only that "[t]o the extent that any data requested

under FOIA are in the public domain, the submitter is unable to make any claim of confidentiality." *Id.* at 1154. Because public availability was not disputed in that case, however, the court expressly declined to address it, much less to determine who has the burden of proof on the issue. *Id.*

As we read the district court, it placed upon the SEC not the ultimate burden of persuasion—the statutory policy favoring disclosure requires that the opponent of disclosure indeed bear that burden, *see Washington Post Co. v. United States Department of Justice*, 863 F.2d 96, 101 (D.C.Cir.1988)—but only the burden of production, and we think that, at least in the posture of this dispute, the district court's allocation of that burden was eminently sensible.

First, as a general matter, it does seem that a reverse-FOIA claimant should not be called upon to prove *non*-public availability; presumably it would have to identify all of the public sources in which the information contained in its documents is *not* reproduced. To state that task is to see that it is bootless. It is far more efficient, and obviously fairer, to place the burden of production on the party who claims that the information is publicly available.

Second, the course of the administrative proceedings in this case makes it particularly difficult to accept the SEC's argument. The FOIA office gave no reasons for its initial denial of confidential treatment, and if the recommendation of the General Counsel's staff gave any such reasons, they were not communicated to Occidental. Thus, the question of public availability was apparently brought to Occidental's attention for the first time when the General Counsel issued his final decision. In effect, then, as the district court found, the General Counsel ruled on a ground of which Occidental had no prior notice and to which it had had no opportunity to respond. This finding, which is not disputed, makes even less convincing the SEC's argument that Occidental had the burden of proceeding before the General Counsel to show that the documents were *not* publicly available.

### 3. Requirement of Document–by–Document Explanations

The district court held that the General Counsel's failure to give a document-by-document explanation for his determination to release the documents made a remand necessary. The court explained:

> ... Since Occidental has never had an opportunity to address the issues on appeal before the General Counsel, whose ruling provides no basis for the Court to review the evidence underlying his ruling on a document-by-document basis, this matter must be remanded for further proceedings.

> . . . . .

> ... With little or no matching of facts against the specific documents, generalized statements that ignore claims advanced by a reverse-FOIA objector are nonreviewable, as the present record illustrates.

> . . . . .

> ... There is no index placing the General Counsel's ruling against specific documents so that a court could determine precisely why any particular document is being disclosed.

*Id.* at 499–500.

On appeal, the SEC argues first that the district court erred in finding as a fact that the General Counsel did not give document-by-document explanations for his decision to release, and second, that in any event, the General Counsel, as a matter of law, was not required to rule on a document-by-document basis. As to the first point, the SEC observes that the General Counsel, in his decision, (1) specifically divided the documents into categories using the letter- and color-coded identification system initiated by Occidental; and (2) separately explained his determination to release each group of documents. On that basis, it claims that "the district court overlooked the fact that the decision is either annotated to the administrative record, or generally identifies the documents in the record which support its conclusions."

To be given its due, the passage quoted from the district court's statement must be read in its context, which plainly shows that the district court was quite familiar with the General Counsel's decision. As the transcripts of the several hearings before the district court make clear, before reaching his decision as to the state of the record, the district judge carefully scrutinized the General Counsel's decision in order to determine how he could review it. He was familiar with both the contents and the structure of that decision, and "overlooked" nothing of any significance to this issue.

■■■ The structure of the General Counsel's memorandum supports the district court's conclusion that, on the administrative record before it, judicial review of the General Counsel's conclusions on any sort of document-specific basis was impracticable. Many of the groups into which the General Counsel had categorized the documents contained hundreds of entries, but the General Counsel's decision did not address any particular documents (or even samples from among the hundreds) by reference to which the district court could test its broadly stated conclusions.

■■■ The question nonetheless remains whether the district court was correct in requiring document-by-document explanations in the first place. The SEC argues that Occidental, as "the proponent of nondisclosure[,] ... carries the burden to prepare such indices," and cites to a number of direct-FOIA cases, most prominently *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C.Cir.1975) (*Vaughn II*), in which we required an agency to provide a document-specific index of its reasons for not releasing particular documents. *See also Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C.Cir.1973) (*Vaughn I*).

The cases cited by the SEC do not support its position, however. First, those cases simply required the agency to explain its decision on a document-specific basis in order to make practically reviewable the decision not to release the documents. Without some kind of index keying specific explanations to particular documents, the court was unable to match the explanations against the documents in order to deter-

mine whether the agency had adequately supported its claim that the documents were exempt from disclosure. *See Vaughn I,* 484 F.2d at 827 ("The need for adequate specificity [in the form of a document-specific index] is closely related to assuring a proper justification by the governmental agency."). *See also Vaughn II,* 523 F.2d at 1144–45.

The *Vaughn* cases should not be read to relieve the agency, in the reverse-FOIA context, of its duty to explain its decision. The agency's "burden" of justifying its decision, whether it be to release or not to release, cannot be shirked or shifted to others simply because the decision was taken in a reverse-FOIA rather than a direct FOIA context. In this case, Occidental "provided six volumes of worksheets ... listing each document or category of documents and the color-coded argument or arguments for confidentiality, and provided space for comments and conclusions," 662 F.Supp. at 498–99, and "had by its written and oral submissions made a positive showing that there were grounds for continued confidential treatment." *Id.* at 498. In addition, Occidental, as was most certainly its burden, brought before the district court the documents it had provided the SEC and for which it was seeking confidential treatment. Certainly, Occidental cannot also be required to supply the General Counsel's document-specific reasons for rejecting its arguments, which reasons the General Counsel did not give to Occidental any more than he has given them to the district court.

Second, the particular posture of this case does not lend itself to the SEC's objections to providing a document-specific explanation for its decision. As noted earlier, the General Counsel's primary reason for denying confidential treatment to most of the contested documents was that the SEC's investigation, and certain of the information uncovered in the course of that investigation, had already been made public. At least when public availability is the ground for denying confidential treatment, the question whether specific information is available in a public source is perhaps inevitably document-specific; it may even

be paragraph-specific or literally fact-specific. A news report, for example, may contain general facts that have some relation to a certain document, but may not reveal other specific, competitively sensitive facts contained in that document. *Cf. Vaughn I,* 484 F.2d at 825 ("It is quite possible that part of a document should be kept secret while part should be disclosed. When the Government makes a general allegation of exception the court may not know if the allegation applies to all or only a part of the information.").

As noted earlier, the party who claims that certain information for which confidential treatment is sought is in fact publicly available is in the best position to point to the public source and to identify the allegedly confidential information set forth therein. Particularly in view of (1) the General Counsel's apparent (and illogical) view that once allegations are made public, information obtained in the ensuing investigation may be treated as similarly public; and (2) his failure to raise the issue of public availability with Occidental before reaching a final decision, we think the district court was wholly justified in sending the case back to the SEC for a more specific statement of its reasons.

The district court's discussion of the need for a document-by-document explanation does have the flavor of a direct order, as the SEC complains, but we do not agree that such an order was improper. The district court was doing precisely what *Overton Park* and *NOW* suggest, *viz.,* requiring the agency to produce an administrative record and a decision that permits the reviewing court to trace the path of the agency's decisionmaking process. Since document-specific treatment may be required in this context, and since the General Counsel did not give any document-specific explanation that could, as a practical matter, be reviewed by the district court, the court was entitled to require such an explanation.

### 4. *The SEC's Policy of Releasing Substantiations*

 The district court commented extensively on the SEC's practice of releas-

ing substantiation materials submitted in support of confidential treatment while the proceedings with regard to the underlying documents are still pending. Its principal concern was with the effect of the policy on the submitter's willingness and ability to place fully on the record, in a judicially reviewable form, the basis for its claim to confidential treatment, but the district court added:

> ... The FOIA regulation makes no provision for advance assurance of confidentiality.... In accordance with the regulation, the FOIA Officer processed Occidental's submission for immediate disclosure at the same time it was still entertaining Occidental's various submissions to substantiate confidentiality for the underlying documents.

. . . . .

> ... [I]t is surely an irrational act not to accommodate one in Occidental's position, by at least reserving for separate consideration the disclosure of the substantiation material until after the validity of the disclosure decision pertaining to the documents themselves has been judicially tested. An oral approach to these problems leads to misunderstanding, as it has here. But anyone required to justify confidential treatment should not have his hands tied behind his back from the outset so that he is unable to put his case fully and fairly before the decider on paper. Serious questions of policy and fair play are involved.

662 F.Supp. at 498, 500.

The SEC contends that the district court, in effect, ordered it to amend its procedures to allow advance assurance of confidential treatment for substantiation materials pending the outcome of a dispute over the underlying documents. The SEC further argues that it is required by law to release the substantiation materials, since they are "agency records" subject to FOIA disclosure, 5 U.S.C. § 552(a), and that it is prohibited by the same law from "agreeing not to disclose [substantiations] during the pendency of a proceeding." Since we read the district court's discussion of the SEC's release policy more as an explanation of how the record arrived at its present cryptic state than as an order directing the SEC to adopt any particular release policy, however, we need not reach the question whether any such order would be permissible.

The SEC characterizes the district court's opinion as "stat[ing] ... that the Commission's procedures should provide an 'advance assurance' of confidential treatment for the confidential treatment requestor's substantiation while the Commission considers the request." We do not read the opinion as ordering the SEC to change its practice, however. The opinion is certainly very critical of the SEC's policy of releasing substantiation materials pending the outcome of the underlying dispute. The district court's ultimate conclusion of law, however, was that the record supporting the General Counsel's decision to release the underlying documents was unreviewable; the court was not presented with any direct challenge to the SEC's decision to release the substantiations. Along the way to its conclusion on the issue before it, the district court simply found that (1) Occidental, apparently because of the SEC's policy, submitted no specific document-by-document argumentation to substantiate its claims to confidentiality; (2) the General Counsel's decision, therefore, addressed only the generic arguments by category of document; and (3) the resulting lack of specificity in the General Counsel's ruling prevented the court, as a practical matter, from performing its reviewing function under *Overton Park.* Based upon our own review of the record as it stood before the district court, we think that the district court's ultimate conclusion as to the reviewability of that record was clearly correct.

In the district court's opinion, the SEC's release policy was one of the factors that combined to produce an unreviewable record. The court's discussion provides potentially useful guidance as to what procedures might produce a record capable of review, but it stops short of requiring that the SEC change its release policy in order to achieve that result. Any procedure that

produces a record capable of judicial review under *Overton Park* must be accepted by the court after remand.

### 5. *The Staff Memorandum*

■ The SEC also suggests that the district court "erred in faulting the General Counsel for failing to include the FOIA Officer's work papers and internal staff communications in the administrative record," although the district court specifically stated that the General Counsel was "within his rights" in not releasing the memorandum. 662 F.Supp. at 500. Again, however, since we do not read the district court's comments as a directive to the SEC —which would indeed make the opinion self-contradictory—we need not reach the question whether such a directive would violate the spirit of *Vermont Yankee*. As we read it, the district court's discussion of the General Counsel's refusal to release the staff memorandum was simply another factor that, in the court's view, combined to make the administrative record unreviewable. On remand, the General Counsel may of course choose not to put the staff recommendation into the administrative record if he can make the record practically reviewable without it.

### 6. *Oral Presentations to the General Counsel*

Finally, we find the SEC's suggestion that the district court ordered it to provide Occidental with an oral hearing on its appeal to the General Counsel to be without merit. The only statement in the district court's opinion that could even arguably be read to that effect is the court's statement that "Occidental has never had an opportunity to address the issues on appeal before the General Counsel...." 662 F.Supp. at 499. An "opportunity to address the issues" does not necessarily involve oral argument, and in fact, read in context, it plainly refers to the court's conclusion, discussed above, that the FOIA office's failure to give a written explanation for its initial determination to deny confidential treatment deprived Occidental of the ability to argue to the General Counsel (in writing or orally) that the FOIA office was wrong.

*See id.* at 498–99. Since the court did not order the SEC to permit oral argument at the administrative level, we need not reach the question whether any such prescription would contravene the teaching of *Vermont Yankee*.

## VI. CONCLUSION

■ As has been seen, *Overton Park* directly controls this case: in order to perform its reviewing function, the district court must examine the rationale for the General Counsel's conclusion that the documents for which Occidental sought confidential treatment were not subject to a FOIA exemption, and for that purpose the court must have before it an administrative record susceptible to judicial review.

Most of the SEC's arguments on this appeal invite us first to read the district court's opinion as specifying the procedures that the agency must follow upon remand, and then to hold that the opinion, so read, violates *Vermont Yankee*. To be sure, such a reading of the court's opinion would not be irrational, given the court's general statements to the effect that the "[c]lear defects in the administrative process ... must be remedied," 662 F.Supp. at 500, and that further proceedings were necessary "to correct the deficiencies the Court has noted." It is equally plausible, however, and more consistent with the principle that agencies should be permitted to fashion their own procedures for decisionmaking, to understand the district court's critique of the SEC's reverse-FOIA procedures as a helpful explication of how, in the court's view, the administrative record emerged from the SEC's rather elaborate (but legally "informal") adjudicatory process in an unreviewable state.

We have adopted the second, more generous, reading of the district court's opinion, and, as such, we find that the court's criticism was not improper. The inadequacy of an administrative record for judicial review may well be, indeed most probably is, due in part to flaws in the procedures by which the agency produced that record. Where that is the case, nothing in *Vermont*

*Yankee* prohibits the reviewing court from so noting on its way to directing a *Camp v. Pitts* remand. The agency may find that additional procedures are necessary in order to produce an adequate record; indeed, it is possible that in some cases only one procedure will suffice to produce a reviewable record. It would still not follow, however, that in such circumstances a remand—even if it would neccesarily cause the agency to follow a particular procedure—would be barred by *Vermont Yankee.* The important point is that *Overton Park's* requirement of a reviewable record must be met; what the Supreme Court once said in a very different context is equally applicable to the agency's production of a reviewable record: "it is the result reached not the method employed which is controlling." *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944).

It is not our office to speculate on what specific alternative procedures the SEC might use in order to produce a record that meets the standard of *Overton Park.* We note only that we see nothing in *Vermont Yankee,* or in any other case, to suggest that a court must abandon its reviewing function when it believes that the reason for the agency's failure to produce an adequate record is traceable to the procedures it followed. The proper course in a case with an inadequate record is to vacate the agency's decision and to remand the matter to the agency for further proceedings. *Camp v. Pitts,* 411 U.S. at 142–43, 93 S.Ct. at 1244; *Florida Power & Light,* 470 U.S. at 744, 105 S.Ct. at 1607. The district court did precisely that.

For all of the foregoing reasons, the district court's order vacating the General Counsel's decision and remanding the matter to the SEC for further proceedings is

*Affirmed.*